IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CRIMINAL NO. 05-30031-WDS |
| ) | |
| DARYL R. WILSON, SR., ) | |
| ) | |
| Defendant. ) | |

MEMORANDUM & ORDER

**STIEHL, District Judge:**

This matter is before the Court on defendant's motion and amended motion to suppress evidence and statements (Docs. 22, 39). The government has filed responses to both motions. The Court held an evidentiary hearing on the motion to suppress and amended motion and took the matter under advisement.

The defendant asserts several grounds for suppression, inter alia: that there were no grounds for approaching the defendant while in his parked car; that he was threatened with a drawn pistol and then his car was searched without his consent; that he was taken to the United States Marshal's Service office and questioned and gave a statement without being given his *Miranda* warnings; and, that he was subsequently questioned at DEA offices in Fairview Heights and that any statement given at that time was tainted by the prior questioning.

**FACTUAL BACKGROUND**[1]

1.      The Arrest of the Defendant.

Special Agent Michael Rehg, DEA, testified that on February 13, 2004, he had received information from an informant, Manfred McGee, that "D-Mack" would be coming from St. Louis and was going to deliver approximately half a kilogram of cocaine in the East St. Louis area, at a Mobil Station at Martin Luther King and Collinsville Avenue. The information was that the individual would be driving a black car with Missouri plates. The car was identified at

---

[1] Several other Deputy Marshals and law enforcement personnel testified at the suppression hearing. Their testimonies, however, were similar or nearly identical to the testimony of S/A Rehg, S/A Weeks, Deputy Woods, and TFD Hill, or they were not on the scene during the arrest of the defendant and the search of his car. Therefore, the Court will not detail their testimonies, although they are part of the record.

some point as either a black Thunderbird or an IROC Camaro. S/A Rehg testified that he realized that this "D-Mack" was Daryl Wilson, whom he knew, and that the car was most likely a Firebird.

     S/A Rehg contacted the United States Marshal's Service for assistance and waited near the station for the car to arrive. They observed a black Firebird come down Martin Luther King Drive, as though he had come off the Martin Luther King Bridge from St. Louis. The defendant crossed over Collinsville Avenue, (which the Court notes is the first intersection off the Bridge exit and approximately 4 blocks from the Marshal's offices in the Federal Courthouse in East St. Louis) slowed down and passed the Mobil Station, entering a parking lot adjoining the Mobil Station. The driver then backed his car into the parking lot. At that point, to be sure it was Wilson, S/A Rehg asked Deputy United States Marshal Thomas Woods to approach the car from behind and try to identify the driver. S/A Rehg testified that as Deputy Woods approached the car from the side, it lurched forward as another car pulled in front of the Firebird, and the defendant was then taken out of the car by Woods and handcuffed. S/A Rehg stated that he believed the defendant was attempting to get away from Deputy Woods, nearly hitting Deputy Woods and a police vehicle, in an attempt to flee the area.

     S/A Kent Weeks, DEA, testified that around noon on February 13, 2004, he and S/A Rehg met with Manfred McGee to discuss his knowledge of a delivery of cocaine which was to be made in the East St. Louis area. McGee identified the delivery person as "D-Mack" who lived in Alton, Illinois and had a second residence in Florissant, Missouri. S/A Weeks testified that McGee stated that D-Mack would be driving a black Firebird and bringing a half kilo of cocaine to East St. Louis. S/A Weeks was in the same car with S/A Rehg when the defendant arrived at the parking lot near the Mobil Station. He heard S/A Rehg ask Deputy Woods to approach the car and check out what the guy was doing there. He, too, observed the driver attempt to pull away as Deputy Woods approached the side of the car, in what he believed was an attempt to flee. There were, at that time, four, or possibly five, other Deputy Marshals around the area as they arrived at the scene.

Deputy Woods testified that on February 13, 2004, he was asked to assist S/A Rehg and to approach a black Pontiac Firebird driven by "D-Mack," a black male, which whom Woods was not familiar. The car was near the Mobil Station in East St. Louis, and was believed to be there to deliver cocaine. Deputy Woods did not see the car enter the lot or park. As he approached the side of the car he made eye contact with the defendant who was in his car backed into a parking space to the east of the Mobil station. At that point, the defendant's car lurched and Deputy Woods thought he was going to be hit by the car. He drew his weapon and shouted to the defendant to stop. Deputy Woods testified that he was dressed in a bulletproof vest clearly marked with "police" and "U.S. Marshal" on it when he approached the defendant's car. As he approached the side of the car he made eye contact with the defendant. At the same time, another vehicle driven by Task Force Detective Hill pulled in front of the defendant's car. Deputy Woods thought the two cars were going to collide, but they did not. Deputy Woods opened the driver's side door and pulled the defendant out of the car. He was placed on the ground and handcuffed. Deputy Woods testified that TFD Hill also had his weapon drawn and pointed at the defendant. The defendant was transported to the United States Marshal's office in the Federal Building by another deputy.

Task Force Detective Danny Hill, now with East St. Louis Police Department, testified that he had learned from S/A Rehg that a black male, approximately six-feet tall, driving a black car, possibly a TransAm, would be making a drug delivery at a Mobil Station in the area of Martin Luther King Drive and Collinsville Avenue. He was positioned about three blocks away from the Mobil Station, and he approached the front of the car as Deputy Woods approached the rear of the defendant's car. As Hill pulled in front of the car it lurched forward, and he then saw Deputy Woods with his weapon drawn yelling, "Police, police." The defendant's car was too close for Hill to get out of the driver's side, so he got on the other side to help to secure the scene. Hill testified that as the car lurched towards his police vehicle, he drew his weapon on the defendant.

    2.    The Search of the Defendant's Car

After the defendant was handcuffed, S/A Rehg, who had moved to the scene as the arrest was occurring from his position a half a block away, approached the Firebird and observed the individual lying on the ground. He recognized him as Daryl Wilson because he had met Wilson previously. As he approached the Firebird he saw a white plastic bag on the back seat on the passenger's side of the vehicle with at clear plastic bag inside in which he could see powder residue which he believed was cocaine. S/A Rehg testified that he believed it to be cocaine because the powder was packaged in the type of bag used for cocaine, and was approximately the size of one half kilogram of cocaine, the size of the delivery they were expecting. He seized the cocaine which was eventually sent to a lab for analysis. Wilson's car was driven to the underground garage of the U.S. Courthouse by a deputy marshal. It was hoped that Wilson would agree to cooperate, and therefore, his car was placed out of public view.

S/A Weeks testified that once they arrived at the car, S/A Rehg went to the passenger's side of the back seat of the car as Weeks was clearing the driver's side, searching for weapons and drugs. S/A Rehg then directed Week's attention to the bag on the back seat of the car.

3. Questioning of Wilson at the Courthouse and at DEA Offices.

Once the defendant arrived at the Courthouse, he was taken into the Marshal's area and S/A Rehg read him his *Miranda* warnings and asked the defendant if he would cooperate. S/A Weeks was present when S/A Rehg read the defendant his *Miranda* rights at the Courthouse. S/A Rehg and Weeks both testified that the defendant was then asked if he wanted to cooperate in the drug investigation. The defendant agreed to cooperate, and, according to S/A Rehg, was acting very "mild-mannered." The defendant was then released, given the keys to his car, and allowed to drive his car to the Fairview Heights DEA office, because the Courthouse would be closing soon. Wilson agreed to follow them to the DEA office and was told by S/A Rehg that if he changed his mind and drove off in another direction, they would "catch up" with him later. The defendant followed S/A Rehg to the DEA offices where he was again given his *Miranda* warnings and was asked to sign a waiver form. The defendant refused to sign anything, but agreed to speak with them. He gave a fairly lengthy interview concerning narcotics trafficking.

4

As part of that interview, he stated that he had been in East St. Louis to deliver some cocaine.

## DISCUSSION

The defendant asserts that the stop of the defendant was improper because he was not sufficiently identified by Manfred McGee. In addition, the vehicle description was not consistent and there was no real evidence that the defendant attempted to flee, but rather that perhaps his foot slipped off the break causing the car to lurch forward.

1.  Reasonableness of the Investigatory Stop

It is well settled in the Seventh Circuit that police can conduct a Terry stop, *Terry v. Ohio*, 392 U.S. 1, 21 (1968), if they have reasonable suspicion, supported by articulable facts, that criminal activity is occurring. *United States v. Swift*, 220 F.3d 502, 506 (7th Cir.2000). Reasonable suspicion amounts to something less than probable cause but more than a hunch. *Id*. The officer's decision to make the *Terry* stop must have been justified at its inception, and the stop must have been reasonably related in scope to the circumstances known to the officer at the time of the stop. *United States v. Quinn*, 83 F.3d 917, 921 (7th Cir.1996). These circumstances might include the behavior and characteristics of the person detained, as well as the experience of the officer. *United States v. Odum*, 72 F.3d 1279, 1284 (7th Cir.1995). A determination of reasonable suspicion "must be based on common-sensical judgments and inferences about human behavior." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000). This determination is made based on the "totality of the circumstances presented to the officer at the time of the detention." *United States v. Askew,* 403 F.3d 496, 507 (7th Cir. 2005) (*quoting United States v. Scheets.* 188 F.3d 829, 837 (7th Cir. 1999)).

Here, there was more than enough information known to the law enforcement personnel to warrant the approach of the defendant's car by Deputy Woods for an investigatory *Terry* stop. S/A Rehg received information that a black male driving a black car would be making a delivery of drugs at the Mobil Station. The defendant, a black male, arrived in a black Firebird, parked near the Mobil Station pulling into the parking space backwards, which put him in position to observe the Mobil Station. As the Seventh Circuit has stated, "a pattern of behavior interpreted

by the untrained observer as innocent may justify a valid investigatory stop when viewed collectively by experienced drug enforcement agents." *United States v. Lechuga,* 925 F. 2d 1035, 1039 (7th Cir. 1991) (*quoted in Askew*, 403 F.3d at 508).

    2.    Degree of Intrusion

Having determined, therefore, that the stop of the defendant was reasonable under *Terry*, the court must determine whether the manner of the stop – car blocked, guns draw – was "reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Vega,* 72 F.3d 507, 515 (7th Cir. 1995) (*quoted in Askew*, 403 F.3d at 508). As the court found in *Askew, id.,* "Drug arrests can warrant intrusive tactics because of their inherent danger. 'Guns are among the tools of the drug trade,' *United States v. Rhodes*, 229 F.3d 659, 661 (7th Cir. 2000), and thus '[a]llowing police to draw their weapons may be reasonable. . . .'" (*quoting United States v. Tilmon,* 19 F.3d 1221, 1227 (7th Cir. 1994).)

Here the defendant was believed to be delivering a substantial amount of cocaine in East St. Louis in the middle of the day near a gas station. Moreover, drug dealers are known to use and carry weapons as part of the tools of their trade. In addition, the fact that the defendant's car lurched away as Deputy Woods approached, and nearly hit the car driven by Hill, gave those officers, apparently the only two who drew weapons, reason to do so. The Court finds, therefore, that the degree of intrusion as part of the *Terry* stop was appropriate under the totality of the circumstances.

    3.    Seizure of Evidence

The defendant asserts that the seizure of evidence from his car was also in violation of his Constitutional rights. It is well settled in the Seventh Circuit that "the plain-view doctrine, . . . allows for seizure of material if (1) a law-enforcement officer is lawfully present, (2) an item . . . is in the plain view of the officer, and (3) the incriminating nature of the item is immediately apparent (i.e., the government can show probable cause to believe the item is linked to criminal activity)." *United States v. Raney*, 342 F.3d 551, 558-59 (7th Cir. 2003) (*citing United States v. Bruce*, 109 F.3d 323, 328-29 (7th Cir.1997)). Here, S/A Rehg testified that he saw a plastic bag

sitting on the back seat as he came up to the vehicle. Clearly, law enforcement was lawfully present in the parking lot, and the incriminating nature of the item was evident to Rehg, as it was packaged in the type of bag used for cocaine and was the size of a half-kilogram.

The Court, therefore, **FINDS** that the evidence was in plain view of S/A Rehg and was properly seized.

4. The Questioning of the Defendant.

The Court finds credible the testimony of S/A Rehg and Weeks that the defendant was given his *Miranda* warnings both at the Courthouse, when he was asked to cooperate, and at the DEA offices where he gave his statement. There is no evidence to the contrary. The defendant's refusal to sign the *Miranda* waiver does not invalidate his waiver. It is well settled that a Miranda waiver need not be express, and may be "inferred from a defendant's understanding of [his] rights coupled with a course of conduct reflecting [his] desire to give up [his] right to remain silent." *United States v. Smith,* 218 F.3d 777, 781 (7th Cir. 2000) (*quoting North Carolina v. Butler*, 441 U.S. 369, 373-76(1979)). Further a "waiver may be inferred from the defendant's conduct, even when [he] has refused to sign a waiver form." 218 F.3d at 781 (*citing United States v. Banks*, 78 F.3d 1190, 1196-98 (7th Cir.1996), *vacated on other grounds*, 519 U.S. 990(1996), *on remand*, *United States v. Mills*, 122 F.3d 346 (1997)).

Accordingly, the Court **FINDS** that the defendant's constitutional rights were not violated and the motion and amended motion to suppress evidence and statements are **DENIED** on all grounds.

**IT IS SO ORDERED.**

**DATED:** August 3, 2005.

                                                **s/ WILLIAM D. STIEHL**
                                                    **DISTRICT JUDGE**